UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

In re:                                                  Case No. GG 18-02814-jtg

CANDACE L. CURTIS,                                      Chapter 13

   Debtor.                              Hon. John T. Gregg

_____/

## OPINION REGARDING MOTION TO DISMISS
## PURSUANT TO 11 U.S.C. § 1307(c)

APPEARANCES:  Benjamin M. White, Esq., WHITE LAW FIRM, PLC, Grand Rapids, Michigan for Candace L. Curtis; Monica H. Beck, Esq. and Jonathon N. Fazzola, Esq., THE FIERBERG NATIONAL LAW GROUP, Traverse City, Michigan, for Madison King

Madison King ("King") filed a motion to dismiss the above-captioned case pursuant to section 1307(c) of the Bankruptcy Code (the "Motion").  King alleges that Candace L. Curtis (the "Debtor") commenced her case as a litigation tactic to circumvent a potentially adverse decision from the United States District Court for the Western District of Michigan (the "District Court"). Maintaining that she seeks relief from her creditors, the Debtor asserts that she filed her case with the requisite good faith.  For the following reasons, the court shall grant the Motion and dismiss the Debtor's case.[1]

## JURISDICTION

The court has jurisdiction pursuant to 28 U.S.C. §§ 1334(a) and 157.  This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (O).

---

[1] The Bankruptcy Code is set forth in 11 U.S.C. §§ 101 *et seq*.  Specific sections of the Bankruptcy Code are identified herein as "section __."  The following constitutes this court's findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052.

## BACKGROUND

In 2012, Chad Curtis ("Curtis"), the Debtor's spouse at the time, was investigated and eventually prosecuted for various acts of criminal sexual misconduct against King and other minors.[2]  Convicted by a Michigan state court jury on August 16, 2013, Curtis shattered the lives of many, including his victims, the Debtor and other family members.  King and three other victims commenced a civil action in the District Court against Curtis and allegedly complicit third parties for various torts.  *King, et al. v. Curtis, et al.*, Case No. 1:14-cv-00403 (W.D. Mich.).[3]  After granting King's motion for summary judgment with respect to her claim for battery against Curtis, the District Court awarded damages to King in the amount of $1.8 million.

In March 2017, the Debtor filed for divorce from Curtis in Michigan state court.  On several occasions thereafter, the Debtor and Curtis discussed potential resolution of their divorce proceeding, including the likelihood that any assets awarded to Curtis could be susceptible to King's collection efforts.  The state court entered a judgment of divorce in January 2018, thereby apportioning the assets and liabilities between the Debtor and Curtis.

King subsequently began post-judgment collection proceedings in the District Court against Curtis, who was at that point incarcerated.  As part of her collection efforts, King obtained jailhouse recordings of conversations between the Debtor and Curtis, among others.  The transcripts reveal that beginning in 2015, the Debtor and Curtis discussed shielding their marital assets and respective revocable trusts from King.

On May 8, 2018, King requested that the District Court (i) join the Debtor as a party to the post-judgment collection proceedings, (ii) deem certain transfers from Curtis to the Debtor to be

---

[2]     From 1992 through 2001, Curtis earned approximately $13 million as a Major League Baseball player.

[3]     The court takes judicial notice of the District Court's docket.  *See* Fed. R. Evid. 201.

actual fraudulent transfers, (iii) require the Debtor and Curtis to appear for debtors' examinations in order to determine their "respective equitable interests" in assets, and (iv) enjoin the Debtor and Curtis, among others, from transferring or otherwise disposing of assets.

Eight days later, the District Court entered an order granting in part, and denying in part, King's motion. The District Court required the Debtor to show cause within twenty-one days from the entry of the order why she should not be joined as a party to the post-judgment collection proceedings. The District Court did not, however, grant any other relief that King requested in the motion. Instead, the District Court required King to supplement her motion within seven days, which she did.

On May 24, 2018, the District Court entered an order requiring the Debtor and Curtis to appear for examinations on June 26, 2018 pursuant to Mich. Comp. Laws § 600.6110(1). Although the District Court enjoined Curtis from making any transfers or disposing of any assets as part of its order, it declined to similarly enjoin the Debtor.

The Debtor filed a response to the District Court's order to show cause on June 6, 2018. In her response, the Debtor did not address whether she should be joined as a party to the post-judgment collection proceedings pursuant to Mich. Comp. Laws § 600.6128. The Debtor instead contested the jurisdiction of the District Court and, alternatively, requested dismissal on *forum non conveniens* grounds.

On June 25, 2018, the Honorable Ellen S. Carmody issued a report and recommendation to the Honorable Janet T. Neff in which she recommended that the Debtor be joined as a party to the post-judgment collection proceedings. In her report, Judge Carmody declined at that time to make any recommendation regarding Curtis' alleged equitable interest in the assets of the Debtor.

Later that evening, the Debtor filed her voluntary petition for relief under chapter 13 in this court, thereby staying the collection proceedings.

In her petition, schedules and statement of financial affairs, as amended, the Debtor disclosed assets worth close to $1 million. The Debtor's most valuable asset is a 23-acre horse farm in Ada, Michigan worth at least $875,000.00.[4] Through her revocable trust, the Debtor owns the horse farm free and clear of any mortgage liens. Less than a year before the petition date, the Debtor, in her individual capacity, leased the horse farm to Cassidy Curtis, one of her daughters, for monthly payments and other consideration. The lease grants Cassidy Curtis a right of first refusal to purchase the horse farm for an undetermined amount, presumably upon the expiration of the lease term in 2022.

According to her schedules, the Debtor has liabilities in the aggregate amount of $13,000. The Debtor has no secured or priority creditors. The Debtor has only five general unsecured creditors, consisting of two credit card companies, two law firms, and King, who is listed as holding a disputed and unliquidated claim in an unknown amount.[5] Shortly after filing her petition, King filed her proposed chapter 13 plan. The plan proposes to pay all creditors 100% of their claims over a five-year period. The plan is based on the assumption that King does not hold an allowed claim.

On August 7, 2018, King filed her Motion alleging that this case was filed in bad faith. After the Debtor responded, the parties engaged in discovery over a protracted period. The court held an evidentiary hearing on January 8, 2019, at which over seventy exhibits were admitted into evidence. As part of her case in chief, King called the Debtor, Curtis, and Lyndsey Dubis, the

---

[4]   In March 2016, the Debtor listed the horse farm for sale with a purchase price of $1.9 million.

[5]   Other than King, only the two credit card companies have filed proofs of claim in the aggregate amount of $6,000.

Debtor's divorce attorney, to testify.  The Debtor did not call any witnesses and elected instead to rely on the cross examination of King's witnesses.  At the conclusion of the hearing, the court took the matter under advisement.

## DISCUSSION

"Chapter 13 relief is reserved for the 'honest but unfortunate debtor.'"  *Alt v. United States (In re Alt)*, 305 F.3d 413, 422 (6th Cir. 2002).  Section 1307(c) provides that a chapter 13 case may be dismissed or converted for "cause," including but not limited to certain examples.  11 U.S.C. § 1307(c); *see In re Cummings*, 523 B.R. 93, 109 (Bankr. W.D. Mich. 2014).  "Cause" for purposes of dismissal or conversion may exist if a debtor lacks good faith when filing the bankruptcy case.  *In re Alt*, 305 F.3d at 418 (citations omitted).

When considering whether a case should be dismissed or converted for lack of good faith, bankruptcy courts in the Sixth Circuit are instructed to consider a non-exhaustive list of twelve factors used to determine if a plan has been proposed in good faith.  *Id*. at 419 (citation omitted). In addition, other factors may be relevant, such as the nature of the debt, the timing of the petition, how the debt arose, the debtor's treatment of creditors both pre and post-petition, and the debtor's motive in filing the petition.  *Id*. (citing *In re Love*, 957 F.2d 1350, 1357 (7th Cir. 1992)).  Taken on the whole, these factors protect against "'an abuse of the provisions, purpose or spirit' of chapter 13."  *In re Gomery*, 523 B.R. 773, 785 (Bankr. W.D. Mich. 2015) (citations omitted).

The party seeking dismissal bears the burden of proof by a preponderance of the evidence. *In re Alt*, 305 F.3d at 420 (citation omitted).  Because good faith is a flexible, amorphous and non-specific determination, the decision should be left to the court's common sense and judgment. *See In re Cummings*, 523 B.R. at 110 (citing *In re Larson-Asplund*, 519 B.R. 682, 691 (Bankr. E.D. Mich. 2014) (citation omitted)).

In this case, King directs the court to numerous alleged badges of fraud that may or may not support a cause of action for actual fraudulent transfers. The purpose of this court's inquiry, however, is not to determine whether any fraudulent transfers were made by Curtis to the Debtor, including through the judgment of divorce. It is simply to determine if the Debtor lacked good faith when she filed her case.[6]

While several of the factors identified by the Sixth Circuit in *Alt* inure to the benefit of the Debtor, they are far outweighed by the Debtor's motive, timing of the petition, her disparate treatment of creditors, and her lack of sincerity. First, the Debtor's motive is of particular importance. After all, it is "not only an appropriate factor to consider when evaluating a debtor's good faith in seeking relief under chapter 13, it is essentially the heart of the good faith inquiry." *Condon v. Brady (In re Condon)*, 358 B.R. 317, 329 (B.A.P. 6th Cir. 2007).

In the years leading up to her bankruptcy filing, the Debtor and Curtis had numerous conversations regarding King's ability to satisfy her judgment against Curtis with assets owned by the Debtor.[7] As part of those conversations, the Debtor stated, among other things, that (i) she did not want King to satisfy her claims against Curtis with the Debtor's assets, (ii) she was considering transferring proceeds from Curtis' pension into her trust account to protect them from King, (iii) she did not believe that her ownership of the horse farm was likely to be considered fraudulent because it was held in her trust, (iv) she didn't want "that witch" King to "get anything," and (v) she would take care of Curtis, even after the divorce. King relies heavily on those statements to demonstrate a lack of good faith. However, the statements were made several years prior to her

---

[6]       While there is some overlap between a debtor's lack of good faith and a claim for an actual fraudulent transfer, the court makes no findings and reaches no conclusions with respect to the latter.

[7]       Mindful that their conversations were being recorded, the Debtor cautioned Curtis in October 2013, "[w]hen you and I can talk in person I'll tell you a couple of the things that [the Debtor's financial adviser] wants to do [with respect to certain assets] because I don't want to mention a couple things on the phone." (Ex. 1, Tr. at 11:14-17).

bankruptcy filing.  As such, they are probative, but not necessarily indicative, of the Debtor's lack of good faith.

The same cannot be said of the Debtor's testimony during the hearing on the Motion, which is indicative of the Debtor's lack of good faith.  During the hearing, the Debtor made several troubling statements.  Although the Debtor acknowledged that she intended to satisfy the claims of her other creditors, she was not necessarily prepared to address any allowed claim of King.  *See Tamecki v. Frank (In re Tamecki)*, 229 F.3d 205, 207 (3d Cir. 2000).  When asked whether she would be willing to use proceeds of any sale of her horse farm to satisfy any allowed claim of King, the Debtor was non-committal.[8]  The Debtor further explained that she planned to sell the horse farm to her daughter.  By doing so, she could not only purchase a new home for herself, but also continue to enjoy the farm.  These intentions are not representative of an honest but unfortunate debtor seeking to reorganize in good faith.[9]

The Debtor's motive is further demonstrated by her efforts to frustrate the jurisdiction of the District Court prior to her bankruptcy filing.  *See In re Myers*, 491 F.3d 120, 126 (3d Cir. 2007) (citing *Huckfeldt v. Huckfeldt (In re Huckfeldt)*, 39 F.3d 829, 832 (8th Cir. 1994)); *Krueger v. Torres (In re Krueger)*, 812 F.3d 365, 374 (5th Cir. 2016).  In her response to the District Court's order to show cause, the Debtor did not address the central issue in that proceeding – whether she should be joined as a party under Mich. Comp. Laws § 600.6128.  Instead, the Debtor contended that the District Court lacked subject matter and federal question jurisdiction.  Furthermore, the Debtor argued that the District Court should decline jurisdiction in favor of the Michigan state

---

[8]     During closing arguments and in response to the court's questions, counsel for the Debtor advised the court that he and the Debtor had discussed the possibility of selling the horse farm in order to satisfy any allowed claim of King in this case.  While Debtor's counsel is a respected member of the bar, his statements are no substitute for the Debtor's actual testimony.

[9]     The Debtor's motive should not be confused with her credibility.  The court found the Debtor to be forthright and honest in her testimony.

courts on *forum non conveniens* grounds.  When the District Court was unpersuaded by the Debtor's arguments, she turned to this court.  The Debtor's strategy sounds in forum shopping, not the need for relief from creditors consistent with the purpose and spirit of chapter 13.

Second, the timing of the Debtor's bankruptcy also persuades the court that she lacks the requisite good faith.  Although filing for bankruptcy on the eve of, for example, a debtor's examination is not necessarily indicative of a lack of good faith, it is certainly probative of a lack of good faith.  *Cusano v. Klein (In re Cusano)*, 431 B.R. 726, 735 (B.A.P. 6th Cir. 2010) (citation omitted).  When the Debtor filed her petition, she was not subject to garnishment, foreclosure, an injunction or any demand for payment by her four other creditors.  Rather, as she testified during the evidentiary hearing, the Debtor decided to file for bankruptcy only after the report and recommendation was issued by the District Court.  The report did not recommend that any liability be imposed upon the Debtor or even enjoin the Debtor from using her property.  In fact, the report specifically stated that those issues would be decided at a later date.  Based on the timing of the petition, the court infers that the Debtor is not seeking to reorganize in good faith.  *See Khan v. Burton (In re Khan)*, 846 F.3d 1058, 1066 (9th Cir. 2017).  She is simply attempting to forestall, if not escape, the post-judgment collection proceedings in the District Court.

Third, the Debtor has relatively few other creditors, all of whom were apparently being paid by the Debtor in the months leading to her bankruptcy filing.  Moreover, the Debtor has sufficient assets to satisfy those creditors many times over.  As such, the Debtor's case is essentially nothing more than a two-party dispute between the Debtor and King.  *See In re Colston*, 539 B.R. 738, 751 (Bankr. W.D. Va. 2015) (citations omitted).  Regardless of the forum, the Debtor will need to address King's claim.  Under the circumstances, the dispute between the Debtor and King is more appropriately adjudicated by the District Court.

Fourth, the Debtor is not proposing to treat her creditors equally as part of this case. The Debtor testified that although she intends to satisfy all other claims in full, she is unwilling to pay King anything. *See In re Tamecki*, 229 F.3d at 207. The Debtor's testimony in this regard, coupled with her intention to keep her horse farm or sell it to her daughter, leads this court to infer that there is a high probability the Debtor would voluntarily dismiss her case instead of selling the farm to satisfy any allowed claim of King. Such litigation tactics would only lead to further delay.

Finally, the Debtor lacks sincerity at this point in time. While there is nothing wrong with disputing a creditor's claim, the Debtor's steadfast refusal to confront King's claims while expressing her intention to sell her most valuable asset to an insider so that the Debtor can continue to enjoy it undercuts any sincerity the Debtor may have. The Debtor apparently seeks relief in chapter 13 so long as that does not entail satisfaction of King's claim. The Debtor's sincerity (or lack thereof) does not comport with the honest but unfortunate debtor.

## CONCLUSION

Curtis' acts were devastating to many people on many levels. As the Debtor testified, she did not cause any damage to King – Curtis did. Nonetheless, King asserts a claim against the Debtor, the merits of which will be adjudicated by the District Court. In the event that the Debtor is liable to King or her circumstances materially change, the Debtor is not necessarily foreclosed from returning to this court. If she does so, however, she must possess the requisite good faith, which she currently lacks.

For the foregoing reasons, the Motion is granted. The court shall enter a separate order consistent with this Opinion.

**Signed: January 23, 2019**





John T. Gregg
United States Bankruptcy Judge